UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN WALDORF,

                            Plaintiff,

        -against-                              05 Civ. 2557 (RJH)

                                                    **MEMORANDUM OPINION**

LIBERTY MAINTENANCE, INC., and                  **AND ORDER**
MANUEL FRANGOS, individually and as an
owner and President of Liberty Maintenance, Inc.,

                            Defendants.

      Plaintiff John Waldorf sued his former employer Liberty Maintenance, Inc., and Liberty's president, Manuel Frangos ("Manny"), under the New York State Human Rights Law ("State HRL"), N.Y. Exec. Law § 296(1)(a), and the New York City Human Rights Law ("City HRL"), N.Y.C. Admin. Code § 8-107(1)(a).  Plaintiff was a project manager for Liberty and its joint ventures, which perform bridge painting and related work pursuant to contract, from October 2001 to December 2004.  Plaintiff was terminated at the age of fifty-two and alleges that his age was the motivation for his discharge.  Defendants respond that plaintiff was terminated because the most recent project managed by plaintiff came to an end, and Manny was able to assume the work performed by plaintiff.  Defendants bring this motion for summary judgment on the grounds that plaintiff has failed to establish a prima facie case of age discrimination and that plaintiff has not met his burden in rebutting defendants' proffered nondiscriminatory explanation for their action.  For the reasons set forth below, the Court grants defendants' motion [27] for summary judgment.

## BACKGROUND

The following facts, viewed in the light most favorable to plaintiff, are relevant to this opinion. In October 2001, plaintiff, then 49 years old, began work as a construction manager for a joint venture between Liberty, Dynamic Painting, and Corcon Industrial Painting ("Corcon") on the Goethals Bridge ("Goethals Project") for the Port Authority of New York and New Jersey. (Waldorf Dep. 10–11(Defs.' Ex. C).) Plaintiff's job responsibilities included reporting to the owner and the Port Authority, attending to correspondence and cost estimates, and running the office at the Goethals Project. (Defs.' 56.1 Statement ¶ 5; Pl.'s Counterstatement ¶ 5.) John Frangos ("John"), one of Liberty's owners, participated in the decision to hire plaintiff (Waldorf Dep. 12) and supervised plaintiff's work on the Goethals Project (Defs.' 56.1 Statement ¶¶ 6–7). At the time, Manny Frangos—John Frangos' son and Liberty's president—was working out-of-state on other projects for Liberty. (*Id.* ¶¶ 8–9.) In July 2002, Waldorf went directly on Liberty's payroll.[1]

During the summer of 2003, while still performing work on the Goethals Project, plaintiff became a member of the Structural Steel Painters Union, Local 806. (*Id.* ¶ 12.) According to plaintiff, he joined the union in order to receive better retirement and health benefits. (*Id.* ¶ 14.) Plaintiff joined Local 806 as a journeyman, although he did not perform any journeyman work, and Liberty subsequently paid him a journeyman's salary, which included an hourly wage rate of approximately $42.50, plus an additional $20–$30 per hour for benefits. (*Id.* ¶¶ 13–15.)

In November 2003, plaintiff began working on another Liberty/Corcon joint venture project at the Madison Avenue Bridge ("Madison Avenue Project"), where he was supervised by

---

[1] Defendants allege that Dynamic Painting hired Waldorf in October 2001 and that Liberty hired Waldorf in July 2002 because Dynamic Painting was having financial difficulties (Defs.' 56.1 Statement ¶¶ 4–11), although defendant Manny testified at his deposition that Waldorf was an employee of Liberty from the start. This dispute is irrelevant to the present motion.

John and Manny.[2] (Pl.'s Counterstatement ¶ 18; Defs.' 56.1 Statement ¶¶ 20–22.)  Plaintiff's job duties at the Madison Avenue Project were essentially the same as his duties on the Goethals Project.  (Defs.' 56.1 Statement ¶ 20.)

By November 23, 2004, work on the Madison Avenue Project was substantially completed.  (*Id.* ¶ 25.)  At the time, Liberty had two other projects:  a project at the Triborough Bridge, for which Liberty had already hired staff and begun work; and a project at the Verrazano-Narrows Bridge ("Verrazano Project"), for which physical work was scheduled to commence in the spring of 2005.  (*Id.* ¶¶ 39–40; Waldorf Dep. 76–77.)  Plaintiff helped develop cost estimates for these projects and hoped to be hired to manage one of them.[3]  (Waldorf Dep. 58, 76, 77)  At some point in December, however, John and Manny told plaintiff that he would not be going to the Verrazano Project because they were hiring Chris Pavlidis instead.  (*Id.* 60–62.)  Pavlidis was a subcontractor hired to supervise steel work on the Verrazano Project, although Liberty terminated Pavlidis in March 2005, only three months after he started work. (Defs.' 56.1 Statement ¶¶ 61–63.)  On December 9, 2004, plaintiff sent an e-mail to Manny, asking him if there was "something we could work out over the winter period, with maybe a reduced salary in lieu of a layoff?"  (Defs.' Ex. J.)  Manny responded, "We are happy with your work.  As a company we have to look at our overhead, though.  I will discuss your proposition with my father."  (*Id.*)  A few days later, plaintiff suggested to Manny that, instead of laying him

---

[2] Defendants allege that during his work on the Madison Avenue Project, plaintiff was an employee of a Liberty/Corcon joint venture, not of Liberty itself (Defs.' 56.1 Statement ¶¶ 18–19), while plaintiff maintains that he was an employee of Liberty at all relevant times.  This dispute also is not relevant to the present motion.

[3] Plaintiff was asked twice during his deposition whether anyone at Liberty ever specifically represented to him that he would be working on the Verrazano Project.  The first time he was asked, plaintiff stated, "Other than the fact that I was involved in putting the estimates together, no."  (Waldorf Dep. 58.)  The second time he was asked, plaintiff answered yes and testified that during the celebration following the announcement of the contract award for the Verrazano Project, either Manny or John told plaintiff that he would work at that project.  (*Id.* 118–120.)

3

off, Liberty could take him off of the union reports and stop paying his union benefits during the wintertime to save money, although plaintiff admitted at his deposition that he knew this arrangement would violate union rules. (Waldorf Dep. 66.) Defendants did not respond to this suggestion, and soon after Liberty offered plaintiff a severance package of $10,000 contingent on his signing an "Employment Separation Agreement and General Release." (Defs.' 56.1 Statement ¶ 41.) Responding to the offer by e-mail, plaintiff refused to sign and stated, "Your determination to fire me, because you apparently think that you can hire someone else to do the job for less money, is not only a breach of our employment contract, but may be unlawful based upon age discrimination . . . ."[4] (*Id.* ¶ 42; Defs.' Ex. R.)

On December 20, 2004, Manny Frangos formally advised plaintiff by e-mail and by letter that he was being laid off and further stated:

> It is a well known fact that the line of work Liberty Maintenance is involved in is seasonal. The normal lay-off and shut down period for companies such as ours is November–March. This is the norm for a majority of the firms in this line of business. As a member of the union, your employment is based on availability of work and manpower requirements. Currently, due to both limited outstanding work and related manpower requirements, Liberty Maintenance, inc. cannot effectively utilize your services. As indicated previously, should either of these circumstances change, and you are still available, we would be happy to recall you from the union hall.

(Defs.' 56.1 Statement ¶¶ 34–35; Defs.' Ex. L.) At his deposition, Manny explained that, in December 2004, all of Liberty's work was concentrated in the New York area, and consequently he was able to manage all existing projects without the assistance of any additional project managers, including plaintiff. (Defs.' 56.1 Statement ¶ 37.) Plaintiff also claims that Manny told plaintiff that he was being terminated because he was "overpaid." (Waldorf Dep. 113.)

---

[4] Plaintiff testified at his deposition that he did not have an employment contract; however, his employment was governed by the collective bargaining agreement with Local 806. (Defs.' 56.1 Statement ¶ 24; Pl.'s Counterstatement ¶ 24.)

4

On March 3, 2005, plaintiff filed suit in this Court, alleging age discrimination and retaliatory discharge. On November 14, 2005, following oral argument on defendants' motion to dismiss the Second Amended Complaint, the Court dismissed plaintiff's claim for retaliatory discharge. On August 1, 2006, defendants moved for summary judgment on plaintiff's age discrimination claims.

## DISCUSSION

### I.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986); *see also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006). A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of that party. *Id.; Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003). In making its showing that a genuine issue of material fact exists, the

5

nonmoving party may not rely on "the mere existence of a scintilla of evidence" to support its position, but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (citing Anderson, 477 U.S. at 252). Although "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), it is "sparingly used where intent and state of mind are at issue because . . . careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination," *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the moving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

## II.     Claims under the New York State and New York City Human Rights Laws

The State HRL makes it unlawful for an employer, "because of the age . . . of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). The City HRL prohibits the same conduct. N.Y. City Admin. Code § 8-107(1)(a). "Although there are differences between the State HRL, the City HRL and the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, age discrimination suits brought under the State HRL and City HRL are subject to the same analysis as claims brought under the ADEA." *Abdu-Brisson*, 239 F.3d at 466 (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997)). ADEA claims, in turn, are analyzed under the same burden-shifting framework as claims brought pursuant to Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.  *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000).  Thus, age discrimination claims brought under the State HRL and City HRL are analyzed using the same framework as any other Title VII claim.

The Second Circuit has stated that to establish a prima facie case of age discrimination under the standard enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "a plaintiff must show (1) that he was within the protected age group, (2) that he was qualified for the position, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination."  *Schnabel*, 232 F.3d at 87 (citing *McDonnell Douglas*, 411 U.S. at 802).  "The burden of proof that must be met to establish a prima facie case is minimal."  *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 199 (2d Cir. 1999).  Evidence that a plaintiff has been replaced by a younger worker is sufficient to give rise to the inference that the plaintiff was the victim of discrimination.  *See Schnabel*, 232 F.3d at 87; *Tarshis v. Riese Org.*, 211 F.3d 30, 38 (2d Cir. 2000) (holding that even replacement by a person within the protected class can give rise to an inference of discrimination where the difference in age "is not insignificant").

Once plaintiff has successfully established a prima facie case, the burden of production shifts to the employer to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions.  *McDonnell Douglas*, 411 U.S. at 802.  "Any stated reason is sufficient; the employer need not persuade the court that the proffered reason was the actual reason for its decision."  *Tarshis*, 211 F.3d at 36.  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and drops from the case," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 & n.10 (U.S. 1981) (internal quotation marks omitted)), and the defendant

"will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination," *Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir. 2001) (quotation omitted)); *see also James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) ("'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains at all times with the plaintiff.'" (quoting *Hicks*, 509 U.S. at 507)).

Plaintiff attempts to sidestep the requirement that he prove his case under the *McDonnell Douglas* burden-shifting framework by insisting that he has offered direct evidence of discrimination, and therefore escaped the requirement of proving his case by circumstantial evidence. He cites *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985), and *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), for the proposition that a plaintiff who presents direct evidence of discrimination need not show circumstances giving rise to an inference of discrimination. Under these cases, "when a plaintiff . . . proves that [a prohibited discriminatory factor] played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [that factor] into account." *Id.* at 258 (plurality opinion); *accord Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997). The Second Circuit has said that the types of direct evidence that potentially warrant a *Price Waterhouse* burden shift include, among other things, "policy documents and evidence of statements or actions by decisionmakers that may be viewed as *directly reflecting* the alleged discriminatory attitude." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173 (2d Cir. 2006) (quoting *Raskin*, 125 F.3d at 60–61); *see Thurston*, 469 U.S. at 121 (citing, as an example of direct evidence of discrimination, *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702 (1978), in which the employer's policy required female

employees to make larger contribution to pension fund than male employees); *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir. 1984) (holding that direct evidence that warrants a burden shift includes "statements by the employer that age was the reason for the discharge"). "To warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Raskin*, 125 F.3d at 61.

Here, plaintiff's "direct evidence" of discrimination is his allegation that, during December of 2004, John and Manny told him that they were replacing him with someone younger and less experienced, Chris Pavlidis, for less money. (*See* Opp'n 9.) A closer look at Waldorf's own deposition testimony cited by him as proof of this statement shows that Manny merely told plaintiff that Liberty had hired Pavlidis to manage the Verrazano Project and that they were laying off Waldorf because he was "overpaid." Plaintiff testified at his deposition as follows:

> Q: Did you ever have a conversation with either John and Manny regarding Chris?
>
> A: Yes.
>
> Q: Did you have a conversation with John regarding Chris?
>
> A: I think it was John or both of them. Both of them in effect told me they were hiring Chris [Pavlidis] to run the Verrazano job. It was confirmed. I don't know who said it first.
>
> Q: Approximately when were you told this information?
>
> A: I would say December 2004.
>
> Q: As you sit here today, do you know whether in fact Chris was ever hired as the construction or project manager for the Verrazano project.
>
> A: I don't know.
>
> Q: Did you ever ask either John or Manny why he was being hired?

9

> A: No.
>
> Q: Other than the fact that Chris was being hired to run the Verrazano job, do you recall anything else concerning the substance of your conversation with either John or Manny?
>
> A: That was basically it, that they were hiring Chris.
>
> . . . .
>
> Q: Do you recall the substance of the conversation that you had with Manny?
>
> A: I think we may have been talking about something that we could work out as far as going to the Verrazano. I was trying to grab at something and they were saying they were hiring somebody else for less money and is younger and less qualified.
>
> Q: Did Manny specifically state to you that the person they were hiring was less qualified?
>
> A: He didn't say that directly, no.
>
> Q: Did he directly tell you that he was in fact hiring someone to replace you?
>
> A: Yes, he said they were hiring Chris [Pavlidis] to manage the Verrazano job.
>
> . . . .
>
> Q: Other than the fact that you were overpaid, did Manny give you any other reason why they were hiring someone else.
>
> A: No, they didn't, just the fact that he cost less than this other gentleman did.

(Waldorf Dep. 57–58, 112–114; *see also id.* 62 (testifying that Manny and John told plaintiff that he was not going to the Verrazano Project because they had hired Pavlidis, and denying that they gave any other reasons for his termination).) In fact, Waldorf testified that the only way he knew that Pavlidis was younger than himself was that he "had seen the guy before and [] knew what his age was and his experience was" (*id.* 107). Indeed, Waldorf did not even testify that anyone at Liberty told him they were hiring Pavlidis because he was cheaper; rather, he testified that "the only way I knew [Pavlidis] was making less money was because he was not union," and that

10

he found out that Pavlidis was not union from another Liberty employee, not from Manny or John Frangos.  (*Id.* 107–08.)

Thus, Waldorf's own testimony regarding defendants' statements to him fails to present direct evidence of age discrimination, and plaintiff has produced no other direct evidence.  When asked if there was any other reason for his belief that Liberty had discriminated against him, Waldorf testified:  "That was the main thing.  They were hiring somebody that was younger and less experienced."  (*Id.* at 108–109.)  Because plaintiff has not offered any direct evidence of discriminatory intent, the *McDonnell Douglas* inquiry is appropriate.  *Johnson v. New York*, 49 F.3d 75, 78 (2d Cir. 1995) ("The McDonnell Douglas framework, which guided the district court's analysis, is intended to assist the fact-finding process when the plaintiff is unable to present direct evidence of discrimination.").

**III.    Plaintiff's Age Discrimination Claim**

    **A.    Prima Facie Case**

Plaintiff has met his burden of establishing a prima facie case.  Defendants properly concede that Waldorf belongs to a protected class (i.e., he is over 40) and that he was subject to an adverse employment decision (i.e., he was terminated).  In addition, defendants do not dispute that Waldorf was qualified for the position that he held.  Defendants argue, however, that plaintiff is unable to show that he was discharged under circumstances giving rise to an inference of age discrimination.  Plaintiff argues that he has satisfied this element of the prima facie case, pointing to his testimony that Manny directly told him that he was being replaced by Pavlidis as project manager for the Verrazano Project.  (Waldorf Dep. 113.)  Although plaintiff does not allege Pavlidis's precise age, the parties seem to agree that Pavlidis was in his late 30s or early 40s at the time (Manny Frangos Dep. 32), and thus the difference in age between Pavlidis and

11

Waldorf was "not insignificant." *See Tarshis*, 211 F.3d at 38 ("A difference of eight years between the age of the person discharged and his replacement, as in the instant case, is not insignificant."). In addition, plaintiff proffers an e-mail sent by Manny Frangos to the Triborough Bridge and Tunnel Authority ("TBTA") on March 12, 2005, which states as follows:

> Gentlemen: Chris Pavlidis is no longer employed by Liberty Maintenance, Inc. Or associated with the VN-29 [Verrazano] project. Please do not give him any information. All matters that were being handled by him will now be handled by me. I will set up at the VN-28 field office.

(Pl.'s Ex. A.) Plaintiff argues that this statement implies that Pavlidis was acting as the project manager for the Verrazano Project until he was terminated in March 2005.

Defendants contend that nothing in this e-mail contradicts Manny's testimony that Pavlidis was hired to manage steel work at the Verrazano Project, and that Manny himself assumed the role of project manager for all of Liberty's projects. (Manny Frangos Dep. 43, 49, 81.) Defendants also argue that plaintiff had no expectation of continuing with Liberty after the Madison Avenue Project ended, citing an e-mail that plaintiff sent to Lou Lyra, the owner of Corcon and a friend of plaintiff's, which said, "I am pretty sure I will be in the job market in the near future, as my time with Liberty is approaching the end. Madison Ave is completed & there is no mention of me going to the VN [Verrazano] job."[5]  (Defs.' Ex. J.)

Although the evidence is conflicting on the issue of whether plaintiff was replaced by a younger man, the Court is conscious that, in establishing a prima facie case, plaintiff's burden is "de minimis." *Chambers*, 43 F.3d at 37. Plaintiff here has provided some evidence that his

---

[5] Defendants also argue that Pavlidis could not have replaced Waldorf because Pavlidis was an independent subcontractor, but the Court rejects this argument. "It is well established in the Second Circuit that a plaintiff is not required to show he was actually 'replaced' by a younger employee in order to raise an inference of age discrimination." *See Williams v. 55th St. Theatre Found.*, No. 93 Civ. 3385 (LBS), 1994 U.S. Dist. LEXIS 12898, 1994 WL 501760, at *5 (S.D.N.Y. Sept. 13, 1994) (rejecting employer's argument that because plaintiff's duties were assigned to an independent contractor, plaintiff was not "replaced").

duties were given to a younger man after plaintiff was terminated; this showing is adequate to raise an inference of age discrimination. *See Williams v. 55th St. Theatre Found.*, 1994 U.S. Dist. LEXIS 12898, 1994 WL 501760, at *5. The Court concludes, therefore, that plaintiff has satisfied the elements of his prima facie case.

### B. Defendants' Non-Discriminatory Reasons for Plaintiff's Termination

Defendants, in turn, have satisfied their burden under *McDonnell Douglas* of articulating legitimate, nondiscriminatory business reasons why Waldorf was discharged. Those reasons include: Manny's assumption of all project management duties; and Liberty's assessment that, "due to limited outstanding work and related manpower requirements, Liberty Maintenance, Inc. cannot effectively utilize [Waldorf's] services" (Defs.' Ex. L). Defendants thus have articulated "clear and specific" reasons for Waldorf's termination, supported by evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (quoting *Hicks*, 509 U.S. at 509 (emphasis omitted)). Pursuant to *McDonnell Douglas*, the burden now returns to plaintiff to raise a triable question of fact about whether he has been the victim of intentional discrimination. *See Burdine*, 450 U.S. at 256.

### C. Pretext

In addition to plaintiff's purported "direct evidence" of discrimination, *see* discussion *supra* pt. II, plaintiff contends that defendants' explanation for terminating his employment was merely a pretext for age discrimination. The employer's "reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. *Hicks*, 509 U.S. at 515. The Court must examine "the entire record to determine whether the plaintiff could satisfy his

13

'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel*, 232 F.3d at 90 (citation omitted); *see Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000) (holding that where plaintiff has presented a prima facie case plus pretext evidence a court may, but need not always, determine that plaintiff has satisfied his ultimate burden).

Plaintiff argues that defendants' claim that Manny was serving as project manager for all of Liberty's projects is belied by Manny's e-mail to the TBTA, which plaintiff believes demonstrates that Pavlidis was the project manager on the Verrazano Project.  Even if this e-mail raises a genuine issue of material fact as to the credibility of defendants' asserted nondiscriminatory reason for his termination, however, it hardly demonstrates that the real reason for Waldorf's termination was his age.  "[A]llegations of replacement by younger workers do not, without more, prove discrimination." *O'Sullivan v. New York Times*, 37 F. Supp. 2d 307, 319 (S.D.N.Y. 1999); *see Futrell v. J.I. Case*, 38 F.3d 342, 348 (7th Cir. 1994) ("Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination."); *Coleman v. Prudential Relocation*, 975 F. Supp. 234, 242 (W.D.N.Y. 1997) (evidence that plaintiff's duties were assumed by a younger woman "might establish the fourth element of plaintiff's prima facie case, but establishing the 'minimal requirements' of a prima facie discrimination case does not necessarily mean that the plaintiff's case is strong enough to withstand summary judgment); *see also James*, 233 F.3d at 154 (affirming summary judgment where employer's reason "could not adequately explain his removal and might therefore be false" but where plaintiff had failed to produce evidence that discharge was motivated by age-based animus). The mere fact that plaintiff was fifty-two at the time of his termination, without more, does not give rise to an inference of age discrimination.

*See, e.g., Corcoran v. GAB Business Services Inc.*, 723 F. Supp. 966, 969 (S.D.N.Y. 1989) ("Neither the comments nor plaintiff's age alone is sufficient to establish an inference of discrimination."). Further, where, as here, an employee is hired at age 49 and terminated at age 52, "there is a strong inference that discrimination was not a motivating factor in the employment decision." *Carlton*, 202 F.3d at 138 (2d Cir. 2000); *see Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 540 (E.D.N.Y. 2006) (holding that the fact that plaintiff was hired at age 63 and discharged at age 65 "undercuts her claim that she was discharged because of her age"); *Pronin v. Raffi Custom Photo Lab, Inc.*, 383 F. Supp. 2d 628, 639–640 (S.D.N.Y. 2005) (finding no age discrimination where "the hiring and firing decisions were made within two years of each other").

Moreover, the alleged statement by Manny that plaintiff was "overpaid" does not support an inference of age discrimination. "To be sure, high salary and age may be related, but, so long as the employer's decisions view each employee individually on the merits, do not impose a general rule that has a disparate impact on older workers, and are based solely on financial considerations," an employer's decision to terminate an employee is not barred by the ADEA or New York law. *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 117 (2d Cir. 1991); *see Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) ("When the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age . . . ."); *James*, 233 F.3d at 153 (holding that an employer's "concern with the elevated costs of senior employees does not constitute age discrimination"); *Woroski v. Nashua Corp.*, 31 F.3d 105, 109–10 n.2 (2d Cir. 1994) ("The ADEA does not prohibit an employer from acting out of concern for excessive costs, even if they arise from age-related facts—such as that employees with long

seniority command a higher salary and benefits expensive [sic] than new hires."). Plaintiff has not alleged that defendants ever made disparaging comments about his age or told him that he was not being transferred to the Verrazano Project because of his age. Plaintiff's claim that he was terminated because of his age is further weakened by his testimony that "a lot of the union guys at work were my age or older," and that he knew Pavlidis was making less money not because he was younger but "because he was not union." (Waldorf Dep. 107–08, 128); *see Del Franco*, 429 F. Supp. 2d at 540; *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 1000 (E.D.N.Y. 1999). Thus, even if plaintiff's allegation that defendants fired him because he was "overpaid" were substantiated, this fact alone cannot create an inference of age discrimination.

Finally, plaintiff argues that the fact that Liberty terminated Pavlidis in March 2005 after receiving a letter from plaintiff's counsel threatening suit for age discrimination demonstrates defendants' consciousness of their wrongdoing. This allegation is based on pure conjecture; plaintiff has presented no evidence to counter defendants' claim that they terminated Pavlidis because Liberty and Pavlidis could not agree on the terms of his subcontract. (Manny Dep. 32.) Such "[c]onclusory statements . . . are insufficient to defeat a motion for summary judgment." *Opals on Ice Lingerie v. Body Lines*, 320 F.3d 362, 370 n.3 (2d Cir. 2003).

Because plaintiff has presented no evidence from which the inference could be drawn that he was discriminated against on the basis of age, he has not satisfied his "ultimate burden." *See James*, 233 F.3d at 154; *Schnabel*, 232 F.3d at 91. Accordingly, defendants' motion for summary judgment on plaintiff's age discrimination claims is granted.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment [27] is granted.

The Clerk of the Court is requested to close this case.

SO ORDERED.

Dated: New York, New York
       March 29, 2007

*/s/ Richard J. Holwell*
Richard J. Holwell
United States District Judge